IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CHRISTOPHER CAMPBELL, | ) | Civ. No. 17-00138 SOM-KJM |
| Plaintiff, | ) ) | ORDER DENYING PLAINTIFF'S |
| vs. | ) ) | MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S |
| DEPARTMENT OF HUMAN SERVICES, STATE OF HAWAII; DOE PERSONS 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; ROE "NON-PROFIT" CORPORATIONS 1-10; AND ROE GOVERNMENTAL ENTITIES 1-10, | ) ) ) ) ) ) ) ) | MOTION FOR SUMMARY JUDGMENT |
| Defendants. | ) ) | |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I.      INTRODUCTION.

        Plaintiff Christopher Campbell alleges that he suffered racial discrimination while employed by Defendant Department of Human Services, State of Hawaii ("DHS").  Given this court's earlier order granting partial judgment on the pleadings, Campbell's remaining claims are a disparate treatment claim and a hostile work environment claim, both under Title VII.  Campbell and DHS have filed competing motions for summary judgment on those claims.

        The court concludes that DHS is entitled to summary judgment.  The majority of Campbell's allegations of discrimination are time-barred or were not administratively exhausted.  For the remaining allegations, Campbell has not

demonstrated that the reasons offered by DHS are pretexts for race discrimination.  As a result, Campbell's motion is denied, and DHS's motion is granted.

## II.       BACKGROUND.

Campbell was employed by DHS in Hilo, Hawaii, from June 2008 until he resigned in July 2018.  *See* ECF No. 97-1, PageID # 866.  He worked as a Vocational Rehabilitation Specialist ("VRS"), assisting deaf and hearing-impaired clients. ECF No. 116-1, PageID # 2071.  Campbell alleges that, while employed by DHS, he was subjected to "a discriminatory, hostile work environment" based on being African-American.  ECF No. 1, PageID # 5.  His claims focus on the conduct of his supervisor, Alison Lee, and his co-worker, Claire Castro.  Campbell alleges that Lee denied him promotions, yelled at and mocked him, threatened to discipline him based on false accusations, and treated him differently from co-workers who were not African-American.  *See id.* at 5-10.  Campbell also alleges that Castro repeatedly used racial slurs, and that no action was taken in response to Campbell's complaints about Castro.  *See id.* at 8-10.

Campbell filed two employment discrimination charges with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Hawaii Civil Rights Commission ("HCRC").  Campbell filed the first Charge of Discrimination on February 18, 2014

("February 2014 Charge"). ECF No. 101-17. In the February 2014

Charge, Campbell alleged that "[o]n September 30, 2013, I was

falsely accused by [Lee] for avoiding an intake interview with a

client," and that "[o]n October 30, 2013, I was passed up for a

Temporary Assignment (TA) position for which I previously held."

*Id.*, PageID # 1558. The EEOC mailed Campbell a "Dismissal and

Notice of Rights" on April 29, 2014, which informed Campbell

that he had the right to file suit within 90 days of receipt of

the notice. ECF No. 101-19, PageID # 1562. The HCRC mailed

Campbell a "Notice of Dismissal and Right to Sue" on May 9,

2014. ECF No. 101-20, PageID # 1563. Campbell did not file

suit within 90 days.

The second Charge of Discrimination was filed on

January 9, 2016, and amended on June 9, 2016 ("June 2016

Charge"). ECF Nos. 101-30, 101-31. The June 2016 Charge

stated, "Since December 2014, [Lee] (Asian) has bypassed me for

TA positions. The last such action took place on July 14, 2015,

when she indicated that [Castro] would be TA between July 15 and

21, 2015." ECF No. 101-31, PageID # 1594. Campbell allegedly

filed a union grievance over the matter and communicated with

Hawaii State Senator Suzanne Chun Oakland about DHS's "violation

of their own discrimination polices." *Id.* The June 2016 Charge

also stated, "On December 1, 2015, I was placed on a Department

Directed Leave of Absence in relation to comments I made about

my supervisor.  I was allowed to return to work on March 4, 2016."  *Id.*  The EEOC mailed Campbell a "Dismissal and Notice of Rights" letter on December 29, 2016.[1]  ECF No. 97-3, PageID # 888.

On March 29, 2017, Campbell filed a Complaint against DHS asserting: (1) a race discrimination claim involving an alleged violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2000e-17, (2) a hostile work environment claim,[2] and (3) a retaliation claim against him as a whistleblower, brought under chapter 378 of Hawaii Revised Statutes.  ECF No. 1, PageID #s 15-21.

On October 2, 2018, the court granted DHS's motion for partial judgment on the pleadings, determining that the Eleventh Amendment barred Campbell's state law claims against DHS.  ECF No. 84.  The court dismissed Campbell's state law claims,

---

[1] The EEOC had notified the HCRC that it was investigating the June 2016 Charge, so the HCRC left it to the EEOC to process Campbell's claim instead of sending its own right-to-sue letter. *See* ECF No. 97-5, PageID # 1046.

[2] The Complaint did not specify whether Campbell was bringing a hostile work environment claim under state law or Title VII. For the purposes of its order granting partial judgment on the pleadings, the court assumed that Campbell was proceeding under both state and federal law and dismissed the state law claims. *See* ECF No. 84, PageID # 446.

leaving for adjudication Campbell's Title VII claims of
disparate treatment and hostile work environment.[3]

On February 6, 2019, both parties filed motions for
summary judgment. ECF Nos. 94, 96. The court heard argument on
the motions on March 19, 2019. ECF No. 121. Trial is currently
set for July 9, 2019. ECF No. 63.

III.     **SUMMARY JUDGMENT STANDARD.**

Summary judgment shall be granted when "the movant
shows that there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); *see Addisu v. Fred Meyer, Inc.*, 198 F.3d
1130, 1134 (9th Cir. 2000). The movant must support his or her
position that a material fact is or is not genuinely disputed by
either "citing to particular parts of materials in the record,
including depositions, documents, electronically stored
information, affidavits or declarations, stipulations (including
those made for the purposes of the motion only), admissions,
interrogatory answers, or other materials" or "showing that the
materials cited do not establish the absence or presence of a
genuine dispute, or that an adverse party cannot produce

---

[3] Campbell's motion for summary judgment includes arguments
related to his state whistleblower claim that was dismissed by
this court. ECF No. 96-1, PageID #s 847-50. His reply states
that these arguments were included in "error" and are
"withdraw[n]." ECF No. 117, PageID # 2947. Therefore, the
court does not address that section of Campbell's motion.

admissible evidence to support the fact." Fed. R. Civ. P. 56(c).

One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323. A moving party without the ultimate burden of persuasion at trial--usually, but not always, the defendant--has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

The burden initially falls on the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex Corp.*, 477 U.S. at 323). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote omitted). The nonmoving party must set forth specific facts showing that there

is a genuine issue for trial. *T.W. Elec. Serv.*, 809 F.2d at
630. "A scintilla of evidence or evidence that is merely
colorable or not significantly probative does not present a
genuine issue of material fact." *Addisu*, 198 F.3d at 1134.

All evidence and inferences must be construed in the
light most favorable to the nonmoving party. *T.W. Elec. Serv.*,
809 F.2d at 631. Inferences may be drawn from underlying facts
not in dispute, as well as from disputed facts that the judge is
required to resolve in favor of the nonmoving party. *Id.* When
"direct evidence" produced by the moving party conflicts with
"direct evidence" produced by the party opposing summary
judgment, "the judge must assume the truth of the evidence set
forth by the nonmoving party with respect to that fact." *Id.*

## IV.        ANALYSIS.

Title VII forbids certain employers from
"discriminat[ing] against any individual with respect to his
compensation, terms, conditions, or privileges of employment,
because of such individual's race, color, religion, sex, or
national origin." 42 U.S.C. § 2000e-2(a)(1). Campbell argues
that DHS violated Title VII by subjecting him to disparate
treatment and a hostile work environment on the basis of his
race.

The court addresses both claims in this order and
concludes that Campbell raises several allegations of

discrimination that are time-barred or that were not
administratively exhausted.  The remaining allegations may
support a prima facia case of disparate treatment, but Campbell
fails to establish that the reasons offered by DHS are pretexts
for race discrimination.  The court therefore denies Campbell's
motion and grants DHS's motion.

### A.    Disparate Treatment Claim.

"A person suffers disparate treatment in his
employment 'when he or she is singled out and treated less
favorably than others similarly situated on account of race.'"
*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th
Cir. 2006) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103,
1121 (9th Cir. 2004)).  To establish a prima facie case for his
disparate treatment claim, Campbell must show that: (1) he
belongs to a protected class, (2) he was qualified for the
position in question, (3) he was subject to an adverse
employment action, and (4) similarly situated individuals
outside his protected class were treated more favorably.  *See
Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir.
2018) (citing *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1123
(9th Cir. 2000)).  If he makes that showing, then the court
applies the burden-shifting framework set forth in *McDonnell
Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, the burden of production shifts to DHS to articulate a legitimate, nondiscriminatory reason for the challenged conduct. *See Campbell*, 892 F.3d at 1012. If DHS does so, the burden then shifts back to Campbell to show that the reason offered is pretextual. *See id.* Campbell "may prove pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003), *opinion amended on denial of reh'g*, No. 00-35999, 2003 WL 21027351 (9th Cir. May 8, 2003) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

The parties do not dispute that Campbell satisfies the first two elements of a disparate treatment claim. They focus on whether Campbell was subjected to an adverse employment action and whether similarly situated individuals who are not African-American were treated more favorably. Campbell alleges that he suffered from several adverse employment actions. The court considers each allegation in turn and concludes that Campbell may have established a prima facie case of disparate treatment with respect to being bypassed for the Temporary Assignment ("TA") position in July 2015 and being placed on Department Directed Leave ("DDL") in December 2015. However,

because Campbell cannot prove pretext with respect to those two actions, his disparate treatment claim fails.

### 1. Adverse Employment Actions.

"For claims of disparate treatment under Title VII, an adverse employment action is one that 'materially affects the compensation, terms, conditions, or privileges of employment.'" *Campbell*, 892 F.3d at 1012 (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

### a. Temporary Assignment Positions.

Campbell argues that he suffered an adverse employment action when Lee assigned the TA position to "Claire Castro, who had less seniority [than Campbell] and [was] not qualified to serve in the position." ECF No. 96-1, PageID # 831. His motion for summary judgment does not specify when or how often he was passed over for the TA position, but in his deposition, Campbell mentioned that Castro was assigned the TA position in October 2013, December 2014, and July 2015.[4] *See* ECF No. 97-8, PageID #s 1091, 1100. Each TA assignment is discussed below.

---

[4] The Complaint also states that, on March 21, 2014, "the Plaintiff discovered [Lee] had been designating an individual with less work seniority than the Plaintiff, over the Plaintiff, who was not of African-American ancestry, for 'Temporary Assignment' to the supervisor's position when Ms. Lee was not in the office." ECF No. 1, PageID # 8. However, there is nothing in Campbell's motion or the record to suggest that an adverse employment action occurred on that date. In any event, as discussed below, such an action would be time-barred.

### i.   October 2013 TA Assignment.

DHS argues that Campbell missed the 90-day deadline to file suit with respect to the claims in the February 2014 Charge, which included the allegation that he was passed over for the TA position on October 30, 2013.  ECF No. 94-1, PageID # 494.  The court agrees.

"Title VII contains several distinct filing requirements which a claimant must comply with in bringing a civil action."  *Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1172, *as amended by* 815 F.2d 570 (9th Cir. 1987).  To file a claim under Title VII, a plaintiff must file a charge with the EEOC within 180 days of the last discriminatory act, or within 300 days "if the aggrieved person has instituted proceedings with a state or local agency with authority to grant or seek relief from such practices."  *See Bouman v. Block*, 940 F.2d 1211, 1219 (9th Cir. 1991) (citing 42 U.S.C. § 2000e5(e)).  Also, a plaintiff's Title VII civil action must be filed within 90 days of receipt of an EEOC right-to-sue letter.  *See* 42 U.S.C. § 2000e-5(f)(1).

The EEOC right-to-sue letter regarding the February 2014 Charge was mailed to Campbell on April 29, 2014.  *See* ECF No. 101-19.  Campbell had 90 days from the receipt of that letter to file suit.  He did not file his Complaint until three years later on March 29, 2017.  *See* ECF No. 1.  Therefore, the

claims in the February 2014 Charge, including the allegation
that he was passed over for the October 2013 TA assignment, are
time-barred.

### ii.  December 2014 TA Assignment.

DHS broadly argues that any alleged adverse employment
actions occurring before March 16, 2015, are time-barred because
Campbell did not timely file an EEOC charge with respect to any
action occurring before that date.  *See* ECF No. 94-1, PageID
#s 495-96.  As mentioned above, a plaintiff must file an
employment discrimination charge with the EEOC either 180 days
or 300 days "after the alleged unlawful employment practice
occurred," otherwise the plaintiff will "lose the ability to
recover for it."  42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R.
Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002) (explaining
that a discriminatory act "occurred" on the day that it
"happened").  "Each incident of discrimination and each
retaliatory adverse employment decision constitutes a separate
actionable 'unlawful employment practice.'"  *Nat'l R.R.
Passenger Corp.*, 536 U.S. at 114.

Campbell filed his June 2016 Charge with the EEOC and
the HCRC on January 9, 2016, before amending it on June 9, 2016.
ECF Nos. 101-30; 101-31.  Three hundred days before January 9,
2016, is March 15, 2015.  This means that the June 2016 Charge
could not have encompassed discrete incidents that occurred

before March 15, 2015.  The allegation that Campbell was
bypassed for the December 2014 TA assignment is time-barred
because he did not file a charge with the EEOC 300 days after
the assignment occurred.[5]

### iii. July 2015 TA Assignment.

It is undisputed that Castro got a TA position on July
14, 2015, that Campbell filed a union grievance over this
incident, and that this incident was administratively exhausted
in the June 2016 Charge.  *See* ECF No. 1, PageID # 10; ECF No.
96-1, PageID # 840; ECF No. 94-1, PageID #s 489, 498.  However,
DHS argues that the incident does not constitute an adverse
employment action supporting Campbell's disparate treatment
claim.

The record provides little detail about the TA
position.  The position appears to give an employee in a VRS
position supervisory responsibilities on a short-term basis
while the full-time supervisor is out of the office.  *See, e.g.*,
ECF No. 113, PageID # 1774 ("There was a rotation whereby some
of the counselors took turn[s] being a TA when Lee was

---

[5] The court notes that, even if allegations of discrimination are
time-barred for the purposes of determining whether Campbell
establishes a prima facie case, the allegations may still be
admissible evidence as relevant background information
supporting a different (timely) claim.  *See Nat'l R.R. Passenger
Corp.*, 536 U.S. at 113 (stating that filing deadlines in 42
U.S.C. § 2000e-5(e)(1) do not "bar an employee from using the
prior acts as background evidence in support of a timely
claim").

absent."); ECF No. 101-31, PageID # 1594 (June 2016 Charge
stating that Castro served as TA for one week); ECF No. 97-8,
PageID # 1100 (indicating during Campbell's deposition that
Castro served as TA from December 26, 2014, to January 5, 2015).
It is not entirely clear what the TA's responsibilities were and
how they differed from those of a VRS.

During his deposition, Campbell testified that, under
his collective bargaining agreement, the TA position was
supposed to be assigned on a rotating basis.  ECF No. 97-8,
PageID # 1100 ("[B]asically there needs to be alternate
selection of TAs, you know.  It's Claire, then it's Chris, then
it's--now it would be Keola, then it's Claire--you know,
whatever the pattern is.  Everyone given an equal opportunity to
TA.  And that wasn't given to me.").  There is also evidence in
the record that the TA position carries increased compensation
and responsibilities.  *Id.* at 1091-1101.  The decision not to
assign Campbell the TA position therefore could have "materially
affect[ed] the compensation, terms, conditions, or privileges of
employment" and could have been an adverse employment action.
*See Campbell*, 892 F.3d at 1012; *see also Fonseca v. Sysco Food.
Servs. of Ariz., Inc.*, 374 F.3d 840, 847-48 (9th Cir. 2004)
(holding that an adverse employment action occurred when the
plaintiff was passed over for opportunities to work overtime);
*Singleton v. Berryhill*, No. 16-cv-02400-SK, 2018 WL 1989545, at

14

*6 (N.D. Cal. Mar. 5, 2018) (holding that denying a temporary assignment constituted an adverse employment action because the position offered a "career opportunity to learn something new").

DHS responds, "Plaintiff filed a grievance with respect to the 7/14/15 TA incident and was reimbursed the amount he would have earned had he TA'd. It was a mistake that the DHS acknowledged and took responsibility for." ECF No. 94-1, PageID #s 505-06; *see also* ECF Nos. 101-25, 101-26, 101-27. The Ninth Circuit has "noted that a successful grievance could change the adverse nature of an employment action, such as where an employee was assigned to less favorable shifts and vacation days, but the employer accommodated her preferences after she complained." *Fonseca*, 374 F.3d at 848 (discussing *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000)). There is a dispute about whether the reimbursement, which amounted to $50.49, sufficiently addressed DHS's admitted error.

Campbell stated in his deposition that he would have earned "much more" had he TA'd:

> Q. So the TA pay that you would have received if you had TA'd during the period of July 15th through July 21st was 50.49?
>
> A. No, it would not have been that. If I were TA'ing on July 15 though 21, it would be much more than $50.

*See* ECF No. 97-8, PageID #s 1101-02. At the hearing, Campbell's counsel also mentioned that Campbell had been promised a future

TA position, but that never happened. *See* ECF No. 116-5, PageID # 2532 (letter dated August 12, 2015 from DHS to Campbell's union representative stating that Campbell would receive compensation for the TA position and "will be given the next Temporary Assignment opportunity"). Thus, whether DHS "accommodated" Campbell following his grievance about the July 2015 TA assignment remains in issue.

Campbell may also be able to show that there were similarly situated employees who were treated more favorably. To do that, Campbell "must identify employees outside [his] race who were similarly situated to [him] 'in all material respects' but who were given preferential treatment; they must 'have similar jobs and display similar conduct.'" *See Campbell*, 892 F.3d at 1015 (quoting *Nicholson v. Hyannis Air Serv., Inc.*, 580 F.3d 1116, 1125 (9th Cir. 2009)); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) ("[W]hether two employees are similarly situated is ordinarily a question of fact." (quoting *Beck v. United Food & Commercial Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007)).

Campbell alleges that Castro and another co-worker, Keola Harris, satisfy this standard.[6] ECF No. 96-1, PageID #s

---

[6] Campbell's motion also states, "Ms. Theone Suzuki, also not African-American, was not subject to the similar treatment suffered" by him. ECF No. 96-1, PageID # 842. He cites to the following excerpt from Suzuki's deposition:

841-42.  The record indicates that Castro and Harris were VRS employees who were assigned the TA position and who are not African-American.  *See* ECF No. 97-8, PageID #s 1077, 1083, 1091, 1100; ECF No. 97-10, PageID # 1133.  This suggests that other employees may have been "treated more favorably" with respect to the assignment of TA positions.  *See Campbell*, 892 F.3d at 1016.

DHS argues that Campbell "was the only African-American in the office . . . , and the only deaf and hard-of-hearing specialist counselor."  ECF No. 94-1, PageID # 512. According to DHS, Campbell "cannot demonstrate evidence of similarly situated employees" because he was the only VRS designated as a deaf and hard-of-hearing counselor.  *Id.*  DHS explains that Castro had less seniority than Campbell and that Harris "was the youth counselor who handled all the teenagers." *Id.* at 509; ECF No. 113, PageID # 1771.  However, "[t]he

---

Q. Is there anything about [Claire Castro's] attitude in the work place or her demeanor in the work place that would cause you any concern about retaliation from her individually?

A. Her attitude.

Q. Could you describe her attitude.

A. If she doesn't like you, she'll--I--haven't experienced it. I just--you know, just from working with her all of these--these years, right next to her, from what I have noticed, if she doesn't like you, her attitude will not be pleasant.

ECF No. 97-9, PageID # 1271.  This excerpt does not on its own establish that Suzuki was a similarly situated employee.

employees' roles need not be identical; they must only be similar 'in all material respects.'" *Hawn*, 615 F.3d at 1157 (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)). DHS does not explain how these differences are material or would have had any impact on the TA assignment process.

On the present record, there are questions of fact going to whether Campbell can present a prima facie case of disparate treatment based on the July 2015 TA assignment. On these motions, this court views the facts in the light most favorable to Campbell and draws reasonable inferences in his favor. However, as discussed below, Campbell does not establish that DHS's reasons for bypassing him for the July 2015 TA position are pretexts for race discrimination.

### b. Department Directed Leave in December 2015.

On December 1, 2015, DHS placed Campbell on DDL with pay. Campbell returned to work on March 4, 2016. *See* ECF No. 97-8, PageID # 1113; ECF No. 101-29; ECF No. 101-38. According to a letter from DHS to Campbell informing him that he was being placed on leave effective immediately, DDL was instituted on the basis of statements that Campbell had allegedly made to his co-worker Lori Nakamura:

> You made the following statements during a
> telephone conversation with co-worker Ms. Lori
> Nakamura on November 20, 2015:

18

- Ms. Alison Lee (your supervisor) has mental problems.

- A psychologist under contract with [the Vocational Rehabilitation Division ("DVR")] stated to you that Ms. Lee is mentally unstable.

- Ms. Lee contributed to the death of her husband.

- You have stumbled onto something big that involves key people within the DVR agency and because of this people in the agency are going to have you removed and you will never be seen again.

- You feel that people in the agency will have you removed much like how Ms. Lee's husband was.

These statements are highly inappropriate and your perceptions cause concern regarding your safety and health. This DDL is being taken to obtain a medical evaluation and address these concerns. The duration of the DDL will be determined by the time it takes to complete this process.

You may be required to report to an independent medical examination conducted by a physician selected by the Employer, the details of which will be arranged and communicated to you when they are available. You are also invited to submit information from your personal physician that certifies your ability to report to work and safely perform your job to expedite this evaluation process.

You are directed to surrender all State property in your possession including identification badges[,] office/building keys and/or cards. For the duration of your leave of absence you are restricted from entering the worksite and contacting any employees.

ECF No. 97-3, PageID #s 911-12.

Campbell raised this incident in his June 2016 Charge
and now argues that his involuntary placement on DDL was an
adverse employment action.  *See* ECF No. 101-31, PageID # 1595;
ECF No. 96-1, PageID # 841.  DHS argues that DDL was not an
adverse employment action because it was "with pay," "limited in
nature," and for the purpose of "obtain[ing] a medical
evaluation to address concerns of Plaintiff's safety and
health."  ECF No. 94-1, PageID #s 509-10.

The Ninth Circuit has not directly addressed whether
involuntary leave with pay is an adverse employment action
supporting a claim of disparate treatment.  The Ninth Circuit
has made clear that the mere act of investigating an employee is
not an adverse employment action.  In *Campbell v. Hawaii
Department of Education*, a teacher argued that her school's
decision to investigate complaints made against her was an
adverse employment action, and the Ninth Circuit stated that
"[t]he mere fact that the school received and investigated
allegations of misconduct against [the plaintiff]--with no
resulting change to the conditions of her employment--is not an
adverse employment action for purposes of her disparate
treatment claim."  892 F.3d at 1013, 1013 n.3 (clarifying in the
process that "merely investigating an employee might be a
sufficient adverse employment action for purposes of a Title VII
*retaliation* claim").

However, the *Campbell* case at least suggests that involuntary leave with pay might constitute an adverse employment action. The plaintiff in *Campbell* had "complain[ed] that, unlike some male teachers who were put on paid administrative leave while the school investigated complaints against them, she was never given leave with pay." *See id.* at 1014. The Ninth Circuit stated, "To the extent that [the plaintiff] complains that *she was not involuntarily placed on paid administrative leave* during the school's investigation of her, she is essentially complaining that the *DOE chose not to alter the terms and conditions of her employment*. By not placing [the plaintiff] on leave, the DOE instead allowed her to continue working just as she had before, with no changes in her duties or the conditions of her work." *Id.* (emphases added). In indicating that a failure to place an employee on paid leave is a failure to alter the terms and conditions of employment, the Ninth Circuit may have arguably indicated indirectly that involuntary paid leave would alter the terms and conditions of employment.

This court need not definitively determine whether the act of placing Campbell on DDL in December 2015 was an adverse employment action. Even if DDL was an adverse employment action, Campbell would still need to establish that there were similarly situated employees who were treated more favorably

21

with respect to DDL decisions.  Campbell's motion for summary

judgment makes no attempt to do so.

Even assuming that he could establish a prima facie

case of disparate treatment based on the December 2015 DDL,

Campbell cannot show that DHS's reasons for placing him on DDL

were pretextual, as discussed below.

### c.  Remaining Allegations of Adverse Employment Actions.

Campbell argues that he suffered several other adverse

employment actions.  The dates of some of these actions can be

ascertained from the record, but others are undated:

- January 30, 2014: Castro "began accusing the Plaintiff of stealing things from her office," and Lee investigated Campbell regarding these allegations.  ECF No. 96-1, PageID #s 831, 840; ECF No. 1, PageID # 6.

- May 12, 2014: "[T]he Plaintiff had to submit a rebuttal to his performance evaluation for the period of April 2013 through March of 2014."  ECF No. 115, PageID # 2045.

- April 22, 2015: Castro and "Plaintiff's supervisor"[7] changed the entry code to the office "without letting the Plaintiff know, which locked him out of the office."  ECF No. 96-1, PageID #s 831, 840.

- [Undated]:[8] "Plaintiff's supervisor" and Castro "conspired to deny [Campbell's] request for 'flex time.'"  *Id.* at 831.

---

[7] Campbell's motion often uses the phrase "Plaintiff's supervisor" without expressly stating whether that person is Lee or someone else.

[8] DHS argues that Campbell's "flex time" request occurred in July 2018, citing the following portion of Keola Harris's deposition:

- [Undated]: "Plaintiff's supervisor" would "change referrals of clients based on Claire Castro's desire, and increase the Plaintiff's workload." *Id.* at 831, 840.

- [Undated]:[9] Lee "repeatedly threatened to take disciplinary action against the Plaintiff after he had filed internal

---

Q. Did Ellen ever express to you that she was scared of Chris or that she was scared of Chris being violent?

A. Yes.

Q. And when was that, and what was the context?

A. I think the two times I can remember are the--after Chris was first suspended and he was going to --after that, and when they were talking about setting up the camera and changing the door locks. And the second time was *when he was supposed to return to work in July of this year*.

Q. *And that was around when the denial*--they were--

A. Yes.

Q. *--talking about denying him flex time*?

A. Yes.

ECF No. 97-10, PageID # 1334 (emphases added). If this is the event that Campbell is referring to, it would be barred. A discrete event occurring several months after a complaint and several years after an EEOC charge cannot be considered as a separate event encompassed in the complaint. At this point, it is neither timely raised nor administratively exhausted and at most may have evidentiary value without itself being the basis of a claim.

---

[9] DHS argues that the only time Campbell made an "internal department complaint[]" was on October 30, 2013. ECF No. 101-13 ("Discrimination Complaint Form" dated October 30, 2013). In Campbell's deposition, he stated in reference to Lee's threats, "There were several that were all within the similar time period." ECF No. 97-8, PageID # 1097. It remains unclear from the record when these alleged threats occurred.

department complaints based on racial discrimination against [him]." *Id.* at 831-32, 841.

- [Undated]: Campbell "changed his work schedule to avoid Ms. Lee and Ms. Castro and close[d] his door at work." *Id.* at 832, 841.

- [Undated]: Lee ordered Campbell to stop taking an online sign language class, "which was directly related to assisting the hearing impaired clients he was assigned to." *Id.* at 832, 841.

- [Undated]: Plaintiff was warned by his union representative that "Plaintiff's supervisor and Claire Castro were trying to terminate him." *Id.* at 832.

As discussed above, Campbell had 300 days from the date of these events to file a charge with the EEOC; otherwise, he may not recover for them. *Nat'l R.R. Passenger Corp.*, 536 U.S. at 110. Three hundred days before January 9, 2016 (the initial filing date of the June 2016 Charge), is March 15, 2015, meaning that discrete events occurring before that date are time-barred. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."). Given their timing, the incidents that allegedly occurred on January 30, 2014, May 12, 2014, and April 22, 2015, cannot form the bases of claims.

Moreover, assuming that the undated incidents occurred after March 15, 2015, it is unclear whether they were

administratively exhausted.  DHS argues that the only actions
exhausted in the June 2016 Charge were "being bypassed for TA on
7/14/15 and being placed on DDL."  ECF No. 94-1, PageID # 498.
The court agrees that those two issues were exhausted in the
June 2016 Charge, but that does not necessarily foreclose the
possibility that other issues were also exhausted.

A plaintiff need not specifically raise an issue in an
EEOC charge to have the issue considered exhausted if the issue
is like or reasonably related to the administrative allegations.
"Incidents of discrimination not included in an EEOC charge may
not be considered by a federal court unless the new claims are
like or reasonably related to the allegations contained in the
EEOC charge."  *Shelley v. Geren*, 666 F.3d 599, 606 (9th Cir.
2012) (quoting *Green v. L.A. Cty. Superintendent of Schs.*, 883
F.2d 1472, 1476 (9th Cir. 1989)).  In determining whether issues
are "reasonably related," the court considers "whether the
original EEOC investigation would have encompassed the
additional charges."  *Id.* (holding that newly alleged incidents
were "reasonably related" to the EEOC charge because the
incidents were "part of the same course of conduct" investigated
by the EEOC).

Campbell makes no argument that these incidents were
"reasonably related" to claims in the June 2016 Charge, and the
court sees none.  The June 2016 Charge states that Campbell was

bypassed for the TA position in July 2015, filed a union grievance and communicated with Senator Chun Oakland over the matter, and was placed on DDL in December 2015. *See* ECF No. 101-31, PageID #s 1594-95. Campbell did not accuse Castro of any wrongdoing; Castro is only mentioned as having gotten the TA assignment in July 2015. *Id*. Therefore, allegations that Castro attempted to get Campbell fired or conspired to deny his flex time request would not have been encompassed in the EEOC investigation into the June 2016 Charge. The June 2016 Charge identifies Lee as the person who failed to assign the TA position to Campbell, but it does not allege that she engaged in any other conduct. *See id.* Campbell does not offer any context for the vague, undated allegations against Lee that he raises in his motion. Nor does Campbell argue that these issues were exhausted. The court cannot deem these incidents part of the same course of conduct alleged in the June 2016 Charge.

Because Campbell failed to exhaust these incidents, this court need not determine whether the incidents could be considered adverse employment actions as a matter of law.

### 2. Legitimate, Nondiscriminatory Reasons.

As discussed above, Campbell may be able to establish that he suffered from adverse employment actions when he was bypassed for the TA position in July 2015 and when he was placed on DDL in December 2015. Assuming that Campbell is able to

establish a prima facie case based on these actions, the next step under the *McDonnell Douglas* burden-shifting framework requires DHS to articulate legitimate, nondiscriminatory reasons for the challenged conduct.  The court concludes that DHS has articulated such reasons for both the July 2015 TA assignment and the December 2015 DDL.

### a.    July 2015 TA Position.

DHS's explanation for bypassing Campbell for the July 2015 TA position was that it was a mistake and that DHS attempted to fix the mistake by paying him the amount that he would have made had he gotten the TA assignment.  ECF No. 94-1, PageID # 514; *see also* ECF No. 101-33, PageID # 1611.  In her deposition, Lee admitted that the TA position should have gone to Campbell.  ECF No. 101-33, PageID # 1611 (stating, "Yes, I made a mistake, and I did that.").

"An employer is required only to offer its honest reasons for its action, even if the reason is foolish, trivial, or baseless." *Mihailescu v. Maryville Nursing Home*, 339 F. App'x 717, 719 (9th Cir. 2009) (citing *Villiarimo v. Aloha Island Air*, Inc., 281 F.3d 1054, 1063 (9th Cir. 2002)).  A mistake may be a legitimate and nondiscriminatory reason for an employer's conduct. *Dep't of Fair Emp't & Hous. V. Lucent Techs., Inc.*, 642 F.3d 728, 746 (9th Cir. 2011) (stating that an employee cannot establish pretext by "simply show[ing] the

employer's decision was wrong, mistaken, or unwise" (citation omitted)); *see also Crumb v. Orthopedic Surgery Med. Grp.*, No. CV 07-6114-GHK, 2010 WL 11509292, at *4 (C.D. Cal. Aug. 18, 2010) ("Even if mistaken, [the proffered reason] was a legitimate, non-discriminatory reason."); *Ali v. Peake*, No. CV 08-0298-PHX-DGC, 2010 WL 396291, at *3 (D. Ariz. Feb. 1, 2010) ("Defendant has stated a legitimate, nondiscriminatory reason for paying Plaintiff too low a salary when she was hired: a mistake.").

In admitting to a mistaken belief that it was not Campbell's turn for the TA assignment, Lee states a legitimate, nondiscriminatory reason for having assigned Castro the TA position in July 2015.

### b.    December 2015 DDL.

DHS stated that it placed Campbell on DDL to "obtain a medical evaluation and address [Campbell's] fitness and safety concerns" based on statements that Campbell had made about Lee, her mental state, and her husband's death.  ECF No. 94-1, PageID # 515.  Campbell allegedly stated, among other things, that "Ms. Lee contributed to the death of her husband," that "people in the agency are going to have [Campbell] removed and [he] will never be seen again," and that "people in the agency will have [Campbell] removed much like how Ms. Lee's husband was."  ECF No. 101-29.

DHS has articulated legitimate and nondiscriminatory reasons for placing Campbell on DDL. DHS says that it needed to place Campbell on leave to properly evaluate any health and safety risks, regardless of whether Campbell actually made the alleged statements or had any health issues. "[C]ourts 'only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless.'" *Villiarimo*, 281 F.3d at 1063 (citing *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 733 (7th Cir. 2001)) (some quotation marks omitted).

DHS articulated a legitimate, nondiscriminatory reason for placing Campbell on DDL.

### 3. Pretext for Race Discrimination.

Because DHS has articulated legitimate, nondiscriminatory reasons for the July 2015 TA assignment and the December 2015 DDL, the burden shifts back to Campbell under the *McDonnell Douglas* framework to show that DHS's articulated reasons for those actions were pretexts for race discrimination. Because Campbell does not show pretext, his disparate treatment claim fails.

Campbell's filings on the summary judgment motions did not clearly articulate that DHS's reasons were pretextual. As a result, before the hearing on the summary judgment motions on March 19, 2019, the court asked Campbell to come to the hearing

prepared to "identify facts in the record indicating that the reasons offered by DHS are pretexts for race discriminations, specifically with respect to the decisions to not assign him the TA position in July 2015 and to place him on DDL in December 2015." ECF No. 119, PageID # 3035. The court's prehearing statement also said, "If Campbell intends to argue that the conduct or statements of Claire Castro support a finding of pretext, he should explain how these two decisions--i.e., the decision to give Castro the July 2015 TA position and the decision to place Campbell on DDL--are attributable to Castro." ECF No. 119, PageID # 3035. Even with this direction, Campbell failed to identify any evidence of pretext.

### a.    July 2015 TA Position.

At the hearing, Campbell's counsel argued that Castro's conduct was evidence that Lee's explanation that she had mistakenly assigned the July 2015 TA position to Castro was pretext of race discrimination. Specifically, he pointed to Castro's use of racial slurs in the office and to instances of Castro's playing loud rap music containing racial slurs. His argument was essentially that, because Lee and Castro had a close relationship, Castro's actions should be attributed to Lee, who was Campbell's supervisor.

However, there is no evidence in the record that Lee knew about Castro's use of racial slurs or playing of rap music.

30

During his deposition, Campbell stated that he complained to Lee about Castro's use of profanity, but was unsure whether he had complained about the rap music that contained racial slurs:

> Q.    Have you ever complained to Alison Lee
> about Claire playing rap music that used the
> N word?
>
> A.    I don't know if I complained about that
> specifically, but in general, I complained
> about Claire's vulgarity, her using
> inappropriate language in the office.  A lot
> of it revolved around the break room, where
> she would--every other word out of her mouth
> was "fuck," "fucking" this, and loud enough
> so that my clients could all hear what was
> going on in the break room.  And it was
> something that I spoke to [Lee] about on
> several occasions, either through email, or
> I might have mentioned it to her in person;
> but I know on several emails, I did bring
> this to her attention, so she was well aware
> of what type of language and vulgarity that
> Claire was bringing into that office either
> through her own mouth or through the music
> she played.

ECF No. 97-8, PageID # 1085.

Campbell's above deposition testimony about profanity does not go to race issues.  Moreover, even if Castro's alleged conduct did exhibit racial animus, the present record does not support Campbell's argument that Lee knew about, condoned, and/or was influenced by the conduct.  Campbell has not offered any "specific and substantial" evidence of pretext with respect to Lee's decision not to assign him the July 2015 TA position. *Villiarimo*, 281 F.3d at 1062 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

In his deposition, Campbell also stated that he
recalled discussing the TA issue with Lee and that she had
acknowledged that she made a mistake:

> Q.  *Did you ever speak with Alison Lee
> about being passed for the July 2015 TA
> position?*
>
> A.  *I know that I spoke to her about being
> passed over for a TA position.  I'm pretty
> sure it was this one, only because I
> remember going to her office and talking
> about it, and she pulled out the HGEA, you
> know, manual or rule book, and she said,
> "Oh, you're right."  And she said, "What do
> you want to do about it?"*  No, that might
> not have been the one.  I'm not sure.
> But I think I did, because there were
> several times I did not in order not to --
> because I could be going to her office every
> day, you know, because of all the things
> that were happening to me.  I did go to her
> office about being passed over for a TA.  I
> just can't say specifically when that was.
>
> Q.  Do you recall if it was before the
> filing of the grievance by HGEA on July
> 30th, 2015?
>
> A.  I think it would have been, because I
> think she was associated with this.  The
> reason why I think there is a connection --
> I just can't say for sure, because I can't
> place a date or anything on it, but it was –
> it's all part of my memory of how it
> eventually ended up. *And this is the only
> TA'ing complaint I had that ended up like
> this, so I think I did go to her about it.*

ECF No. 97-8, PageID #s 1100-01 (emphases added).  Campbell also
noted that, after he filed a union grievance, DHS accepted blame
and attempted to remedy the error.  *See id.* at 1101.

Campbell has not presented evidence that "a discriminatory reason more likely motivated" DHS with respect to the July 2015 TA position or that DHS's explanation is "unworthy of credence." *See Raad*, 323 F.3d at 1196.

### b. December 2015 DDL.

The record contains no evidence that DHS's reason for placing Campbell on DDL was pretextual. In his deposition, Campbell admitted to making certain statements to his co-worker Lori Nakamura:

> Q. Okay. Did you tell Lori that Alison Lee has a mental problem?
>
> A. Put it this way. *The basic answer is yes.* I had spoken to Dr. Joseph Bratton because of my situation in the office and what I was going through and Alison's behavior for any of us that worked with the mentally ill is alarming[.]
>
> . . . .
>
> Q. What is your basis for saying that Alison may have contributed to the death of her husband?
>
> A. The basis of me saying that is all my experience working with people with major depression; and Alison lost her husband, and Ellen told me that he had major depression and that it ran in the family, and the way in which he died is an indication of some things going on.
>
> . . . .
>
> Q. How did [Lee's husband] die?
>
> A. He committed suicide. So that's part of the reason why, in my estimation, knowing

other people who have done the same thing
and why, how having an individual behaving
in the fashion that Alison Lee was behaving
--and who knows what she was doing at home,
except Ellen told me how bad it was--*I
absolutely feel that her behavior
contributed to his committing suicide.*

. . . .

A.   [Reading DHS letter regarding DDL]  Oh,
"You have stumbled onto something big that
involves key people within the DVR agency
and because of this, people in the agency
are going to have you removed and you will
never be seen again."

Q.   Did you tell Lori Nakamura this?

A.   *I don't recall my exact words, but
something to that effect, yes.*

ECF No. 97-8, PageID #s 1097-99 (emphases added).

When Campbell was asked during his deposition why he
believed that he was placed on DDL due to his race, he responded
that "this whole thing is based on race."  *Id.* at 1090.  This
conclusory statement by Campbell himself does not, without more,
constitute "specific and substantial" evidence of pretext.
*Villiarimo*, 281 F.3d at 1062 (9th Cir. 2002).

At the hearing, Campbell's counsel argued that Castro
and Lee had falsely characterized Campbell as being a violent
individual and that Lee had lied in saying that others in the
office were afraid of Campbell.  However, in her deposition, Lee
stated that she was not involved in the decision to place
Campbell on DDL:

> Q.   And who suspended [Campbell] on
> December 1st, 2015?
>
> A.   The department, I believe.
>
> Q.   Was an investigation conducted?
>
> A.   I didn't even know about it, I just was
> asked to serve the papers.  I had no idea.
> I found out the same time [Campbell] found
> out.

ECF No. 101-33, PageID # 1617.  Nothing in the record establishes that Lee or Castro was involved in DHS's decision to place Campbell on DDL.

Campbell has not provided admissible evidence that DHS's explanation for placing him on DDL in December 2015 was a pretext for race discrimination.

### C.   Hostile Work Environment Claim.

To establish a prima facie case for his hostile work environment claim, Campbell "must be able to show that, because of his race, he was subjected to unwelcome conduct that was 'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" *See Campbell*, 892 F.3d at 1016-17 (quoting *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017)).  The work environment must be both subjectively and objectively perceived as abusive.  *Id.*  A court considers "all circumstances, with a particular focus on issues such as the frequency and severity of the conduct, whether the conduct was physically threatening or

humiliating, and the extent to which it unreasonably interfered with Campbell's work performance." *Id.* Campbell must also show that DHS is "liable for the harassment that caused the hostile environment to exist." *See id.* (quoting *Freitag v. Ayers*, 468 F.3d 528, 539 (9th Cir. 2006)).

Campbell argues that, while employed by DHS, the "discriminatory hostility in the workplace was severe and pervasive." *See* ECF No. 96-1, PageID # 832. The court concludes that his hostile work environment claim fails because it was not administratively exhausted.

### 1. Castro's Alleged Use of Racial Slurs.

Campbell's hostile work environment claim rests on statements allegedly made by Castro, who was his co-worker. Castro allegedly "used words 'nigger, chink haole,' 'jap' to denigrate clients with disabilities in the workplace" and, on April 23, 2014, Campbell learned that Castro was "routinely playing 'Rap' music in her office where the artists used the word 'nigger' on a regular basis." *Id.* at 832, 845-46; ECF No. 1, PageID # 9. Campbell alleges that Castro repeatedly used the derogatory term "nigger" in the workplace and that, on April 15, 2014, she "blurted out loudly the word 'nigger' just before entering her office, which was next to [Campbell's], with other co-workers present." ECF No. 96-1, PageID #s 833, 845-46.

DHS argues that these allegations are time-barred and were not exhausted in the June 2016 Charge. *See* ECF No. 94-1, PageID #s 495-98. With respect to timeliness, hostile work environment claims are treated differently from disparate treatment claims because, by "[t]heir very nature," hostile work environment claims involve "repeated conduct." *Nat'l R.R. Passenger Corp.*, 536 U.S. at 115. An "unlawful employment practice" does not occur on any particular day, but rather "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). As such, "behavior alleged outside the statutory time period . . . is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.* at 105. Additionally, "[a]s long as the employer has engaged in enough activity to make out an actionable hostile environment claim, an unlawful employment practice has 'occurred,' even if it is still occurring." *Id.* at 117.

It is unclear from the record whether Campbell alleges any conduct by Castro that occurred within the statutory time period. As discussed above, the applicable time period in this case is March 15, 2015, to January 9, 2016, when Campbell

originally filed the charge that, after amendment, became the June 2016 Charge.  The only dates given by Campbell with respect to Castro's conduct are in April 2014.

Even if the conduct alleged is not time-barred, Campbell did not exhaust his hostile work environment claim because it is not "reasonably related" to the claims in the June 2016 Charge.  *Shelley*, 666 F.3d at 606.  Nowhere does the June 2016 Charge mention the use of racial or derogatory terms in the office, discriminatory conduct by Castro, or the existence of a hostile work environment.  At the end of the June 2016 Charge, Campbell states, "I believe that I have been subjected to discrimination due to my race (Black) and in retaliation for engaging in a protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended."  ECF No. 101-31, PageID # 1595.  This statement does not encompass all possible conduct involving racial discrimination.  Because "the original EEOC investigation would [not] have encompassed the additional charges," Campbell has not exhausted his hostile work environment claim.  *See Shelley*, 666 F.3d at 606.

Campbell also has not established DHS's liability for creating a hostile work environment.  "When harassment by a supervisor is at issue, an employer is vicariously liable, subject to a potential affirmative defense."  *Dawson v. Entek Intern.*, 630 F.3d 928, 939 (9th Cir. 2011) (citing *Nichols v.*

*Azteca Restaurant Enters.*, 256 F.3d 864, 877 (9th Cir. 2001)).
However, when the alleged harasser in a hostile work environment
claim is a co-worker, "the plaintiff must prove that the
employer was negligent, *i.e.* that the employer knew or should
have known of the harassment but did not take adequate steps to
address it." *Swinton v. Potomac Corp.*, 270 F.3d 794, 803 (9th
Cir. 2001) (citing *Nichols*, 256 F.3d at 875). Campbell has not
presented sufficient evidence demonstrating that Lee or any
supervisor knew or should have known of Castro's alleged use of
racial slurs.

In her deposition, Suzuki stated that Castro played
rap music every day, and she answered "Yes" when asked "Was
[Castro's rap music] loud enough for everyone in the office to
hear?" ECF No. 97-9, PageID # 1265. However, beyond this
general statement, Suzuki did not provide any information
indicating that anyone complained to Lee about the music or that
Lee was present when the music was played. When asked whether
Castro ever said the "N word" in front of Lee, she responded,
"No, or not that I am aware of. I'm sorry." *See id.* at 1264.

At most, Campbell stated in his deposition that an
office assistant named Candy Kobayashi complained to Lee about
Castro's playing of rap music:

> Q. Did Claire ever say directly to you or
> call you nigger?
>
> A. Not to my face.

39

Q.    So when would she use that word?

A.    When?

Q.    Yeah.

A.    *The time I heard it was in April of
2014,* and she was also the one who would
play this rap music in the office that used
the N word, completely inappropriate.  But
nothing was done.

Q.    Did you hear her playing rap music that
used the N word?

A.    Yes, I have.  And I was not the only
one bothered by it.  *The clerical workers
went to Alison Lee to complain about it, but
Alison did nothing.*

Q.    That's Candy and Dawn?

A.    Yes.  *It was Candy that would have
spoken to Alison.*  Dawn was temporary
assignment.  She was afraid that if she
spoke out about what was going on in the
office, that she may lose her job, but she
was well aware of what was going on.

ECF No. 97-8, PageID # 1085 (emphases added).  Kobayashi appears

to have complained to Lee once in August 2014, which would fall

outside of the applicable time period for Campbell's claim.

Moreover, Campbell provides no further detail regarding

Kobayashi's alleged complaint, so the court is unable to

determine how Lee responded to the complaint.

Given the lack of timely evidence that Lee or any

other supervisor knew about Castro's alleged conduct, Campbell

has not shown that DHS would be liable for that conduct.

## 2. Other Allegations Contributing to Hostile Work Environment.

Campbell's motion also appears to argue that other conduct contributed to the creation of a hostile environment at DHS (dates included where discernible from the record):

- April 22, 2015: "Plaintiff's supervisor gave Claire Castro the authority to change the entry code to the office and did so without telling the Plaintiff." ECF No. 96-1, PageID # 834.

- "In 2016, the Plaintiff's supervisor, Ms. Allison Lee continually threatened him with discipline for insubordination based on misrepresentations." *Id.*

- May 18, 2015: "Ms. Suzuki noticed that her co-workers, including Alison Lee were 'shunning' the Plaintiff." *Id.*

- [Undated]: "Ms. Lee and Ms. Castro spread the false rumor through the office that the Plaintiff was violent and dangerous." *Id.*

- [Undated]: "Plaintiff changed his work schedule to avoid Ms. Lee and Ms. Castro and close his door at work." *Id.* at 835.

- [Undated]: "Ms. Lee also ordered the Plaintiff to stop taking on-line sign language class which was directly related to assisting the hearing impaired clients he was assigned to." *Id.*

Most of these allegations are repeated from Campbell's disparate treatment claim. As discussed above, these incidents are either time-barred or were not administratively exhausted. The allegations that Lee "shunned" Campbell and that Lee and Castro spread rumors about Campbell are specific to the hostile work environment claim. However, they are not "reasonably

related" to the claims raised in the June 2016 Charge and therefore were not exhausted. Nor is it clear that these relate to race, or any other Title VII category.

## V.    CONCLUSION.

Campbell's motion for summary judgment is denied, and DHS's motion for summary judgment is granted. The Clerk of Court is directed to enter judgment for Defendants and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, April 23, 2019.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Christopher Campbell v. Department of Human Services, State of Hawaii, et al., Civ. No. 17-00138 SOM-KJM; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT.